# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RIKITA BONNER-GIBSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-00298** |
| | ) | **Judge Aleta A. Trauger** |
| **GENESIS ENGINEERING GROUP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Genesis Engineering Group ("Genesis") has filed a Motion for Summary Judgment (Docket No. 32), to which Rikita Bonner-Gibson has filed a Response (Docket No. 45), and Genesis has filed a Reply (Docket No. 50). For the reasons stated herein, Genesis's motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Bonner-Gibson's Time at Genesis Before Her Pregnancy

#### 1. Bonner-Gibson's Hiring and Licensure Status

Genesis is an engineering firm founded in 2010 by Russell Skrabut. When Bonner-Gibson was an undergraduate student at Tennessee State University, Skrabut was one of her professors. In February 2012, after Bonner-Gibson had graduated, she began work for Genesis in an entry-level position as a structural engineer. (Docket No. 46 ¶¶ 2–8.)

The parties agree that Bonner-Gibson was expected, at least eventually, to obtain her Professional Engineering ("P.E.") license, which would allow her to oversee her own projects. Until she did so, a licensed engineer was required to supervise her closely and sign off on her work. (*Id.* ¶ 11.) Genesis concedes that Bonner-Gibson has testified that she was not given a formal or

specific timeline for her licensure. (Docket No. 51 ¶ 11.) Skrabut has testified that it is "industry standard" that receiving one's P.E. "takes four years generally after you graduate from college with an accredited degree." (Docket No. 47-5 at 89.) Prior to taking the P.E. licensing exam, an applicant is required to pass one of two other exams—the Fundamentals of Engineering ("Fundamentals") exam or the Engineering Intern ("E.I.") exam. (Docket No. 46 ¶ 12.) Bonner-Gibson took the Fundamentals exam in 2015 but did not pass. She did not attempt the exam again during her time at Genesis. (*Id.* ¶¶ 13–14.)

### 2. Bonner-Gibson's Pre-Pregnancy Absences from the Office

Genesis requires its employees to work at least forty hours per week between the normal business hours of 7:00 a.m. and 6:00 p.m. The parties agree, however, that Genesis expressly maintained a policy of allowing employees to have a "flexible work schedule." In addition, employees were given fifteen days of paid time off to be used at their discretion. Bonner-Gibson claims that Genesis agreed to allow her to work from home in meeting her minimum work hours, and Genesis concedes that "there were occasions over the years" when Bonner-Gibson was given permission to work from home. (*Id.* ¶¶ 15–18; Docket No. 51 ¶ 18.)

Employee requests for time off or changes in schedule required the approval of Skrabut or Chou Wun Yong (another managing member of the company), depending on the nature of the request. (Docket No. 46 ¶¶ 5, 19.) Genesis maintains that Yong could approve minor scheduling adjustments, such as those needed for only a day, whereas only Skrabut could approve more substantial changes. (*Id.* ¶ 19.) The parties agree that, in practice, Bonner-Gibson communicated variously with either Skrabut, Yong, or both about requested scheduling adjustments and both managers had approved adjustments for Bonner-Gibson in the past. (*Id.* ¶¶ 20–23; Docket No. 51 ¶ 21.)

**a. January 6–7, 2015.** On January 6, 2015, Bonner-Gibson emailed Skrabut, Yong, and another Genesis employee, Jacob Heltemes, explaining that she intended to work from home because her "bottom lip [was] swollen twice its normal size and [had] fever blisters all over it." (Docket No. 46 ¶ 24.) Skrabut forwarded the email to Genesis Director of Finance and Administration Lisa Haney, who handled the company's human resources (and whom the court will call "Ms. Haney" because there is another Haney involved in this case). Skrabut wrote to Ms. Haney, "Please document for me. This is becoming a problem with her." (*Id.* ¶ 25.) Ms. Haney responded to Skrabut, asking if there was a way to see what Bonner-Gibson was accomplishing while working from home. (*Id.* ¶ 27.) Later, another managing member of Genesis—Mike Haney—sent Ms. Haney an email agreeing that Bonner-Gibson's absences had become a problem and suggesting that the company begin keeping track of her sick days and absences. (*Id.* ¶ 28.)

On the morning of January 7, 2015, Bonner-Gibson sent Skrabut, Yong, and Heltemes an email, stating that she had spoken to her doctor, who had advised her not to drive because medications she was taking had made her "dizzy and disoriented." She said she would "still try to work from home today and pray my condition improves." (*Id.* ¶ 29.) Medical records from Bonner-Gibson's physician confirm that she had seen the physician the day before, but they do not show that she was placed on a driving restriction. (*Id.* ¶ 30.)

**b. February 9, 2015.** On February 9, 2015, Bonner-Gibson sent an email, informing Skrabut that she would be unable to come in to work because she was experiencing full-body pain and was unable to get out of bed. Skrabut responded with an email stating that he was concerned about the amount of sick time Bonner-Gibson was taking. He also suggested that, "[i]f you are sick to the degree you mention, you need to not be doing any work related tasks." (*Id.* ¶¶ 31–32; Docket No. 35-5 at 39.)

**c. May 12, 2016.** On May 12, 2016, Bonner-Gibson emailed Skrabut, telling him that she would be coming in to work late after having worked late on a project the night before. Skrabut responded with an email, stating the he needed her at work as soon as possible and explaining that she needed to be present and available to handle tasks that were necessary in order to keep projects moving. (Docket No. 46 ¶ 39.) Skrabut forwarded the email to Yong, stating, "I just don't understand this. I am again very inclined to find a replacement for her. The work is piling up on her desk and she is just not good [at] managing things to keep moving." (*Id.* ¶ 40.) Yong responded that he was "[n]ot sure how to react to this" and considered Bonner-Gibson "a great help," although he believed she did not have "much 'common sense' in work." (*Id.* ¶ 41.)

**e. January 2–3, 2017.** On January 2, 2017, Bonner-Gibson emailed Skrabut and Yong to inform them that she would be taking two days off from work because her cousin had died. (*Id.* ¶ 43.) Skrabut forwarded the email to Ms. Haney and Mr. Haney, indicating that he was considering a change to the company's policies for approving time off. (*Id.* ¶ 44.)

### 3. Other Alleged Pre-Pregnancy Issues with Bonner-Gibson's Performance

Skrabut testified that he had "hand picked," "coached," and "mentored" Bonner-Gibson and "tried to bring her along as long as I possibly could," but, "after several years, it just started to become clear that she wasn't progressing." (*Id.* ¶ 46.) Genesis has identified evidence of a number of incidents described in Bonner-Gibson's own testimony in which Bonner-Gibson encountered mostly minor difficulties at work, such as, for example, being unable to complete a task as quickly as a client desired. (*Id.* ¶¶ 47–49.)

Genesis has also produced an affidavit from Richard Clem, a project manager for a Genesis client, who worked with Bonner-Gibson. Clem states that he was unhappy with aspects of Bonner-Gibson's work, particularly her failure to follow through with requested changes and her lack of

responsiveness when Clem attempted to contact her. Clem states that he informed Skrabut of his displeasure with Bonner-Gibson on several occasions. (*Id.* ¶¶ 50–52; Docket No. 35-7 ¶¶ 3–6.) Dan Shehan, the director of construction for another Genesis client, also provided an affidavit detailing his problems with Bonner-Gibson. According to Shehan, Bonner-Gibson had refused to consider changes that Shehan had requested, and Shehan was forced to contact Yong to resolve the resulting problems on two different projects. (Docket No. 46 ¶¶ 53–54; Docket No. 35-8 ¶¶ 2–4.) Bonner-Gibson concedes, for the purposes of this motion, that another employee, a white male named John Wiseman, was terminated following client complaints. Bonner-Gibson testified, however, that Wiseman's errors were significantly more severe than hers. (Docket No. 46 ¶¶ 55–56; Docket No. 35-1 at 159.)

In December 2016, Skrabut gave Bonner-Gibson a performance evaluation. Genesis has produced what it alleges is a copy of the written evaluation she received. (Docket No 35-9 at 12–14.) The evaluation identifies numerous categories in which Bonner-Gibson's performance was rated "inconsistent" or "unsatisfactory" and none in which it was rated "exceptional" or "highly effective." (*Id.*) Bonner-Gibson concedes that she received an evaluation in December 2016 and met with Skrabut and Yong about it, but she testified that the evaluation presented by Genesis is inconsistent with her memory of how she had been rated. Specifically, she testified, "I don't remember having so many inconsistent and unsatisfactory [ratings] ever." (Docket No. 35-1 at 72.) Genesis has provided an affidavit from a proffered digital forensics expert purporting to establish the authenticity of the evaluation. (Docket No. 35-9.) Bonner-Gibson received a raise and a bonus shortly after the evaluation, but Skrabut testified that it was the minimum bonus and raise awarded to Genesis employees that year. (Docket No. 46 ¶ 62.)

**B. Bonner-Gibson Informs Genesis She is Pregnant**

In May 2017, Bonner-Gibson informed Genesis that she was pregnant. (*Id.* ¶ 63.) Bonner-Gibson has testified that, after the company learned she was pregnant, she was given an increased workload with "more work and faster deadlines than anyone." (*Id.* ¶ 64.) She also testified that, after Skrabut and Yong learned about her pregnancy, they began providing her less mentorship and assistance in learning how to solve engineering problems on clients' projects. (Docket No. 35-1 at 42–43.)

According to Bonner-Gibson, Skrabut told her that he "did his research and he found out that most first-time moms take off three to four years and he wanted to make sure that [she] was committed and coming back." (*Id.* ¶ 65.) When Skrabut voiced concern about first-time mothers losing interest in work, Bonner-Gibson told him that she loved her job and expected to return to the office after six weeks. (Docket No. 35-1 at 45–46.) She testified that Skrabut nevertheless continued to raise the issue, and, when she began experiencing complications related to her pregnancy, expressed concern about whether she would be able to "give a hundred percent" to her job. (Docket No. 46 ¶¶ 66–67.) Bonner-Gibson testified that Skrabut brought up the issue of her post-pregnancy return "weekly," in a manner that was "excessive and kind of . . . aggressive." (Docket No. 47-2 at 75–76.)

Bonner-Gibson requested some minor accommodations related to her pregnancy—such as having a parking spot near the door and being allowed to elevate her feet at work—which were granted. (Docket No. 46 ¶¶ 74–75.) She also, at times, missed work for pregnancy-related reasons. For example, on August 23, 2017, Bonner-Gibson texted Skrabut and Yong to inform them that she was experiencing bleeding and was going to receive an emergency ultrasound. That afternoon, she informed them that she and the baby were fine but that she had been placed on some physical

restrictions. (*Id.* ¶¶ 77–78.) Bonner-Gibson has testified that, despite these occasional absences, she continued to work 50 to 60 hours per week and, for at least part of the pregnancy, also attended work-related licensure classes four nights a week. (Docket No. 47-2 at 136–37.)

## C. Incidents of September 20–22

On September 20, 2017, Bonner-Gibson sent an email to Skrabut and Yong, informing them that she was experiencing symptoms that she believed might be false labor and she was going to call her doctor about what to do. She said, "If everything is ok, I will work from home this afternoon." (Docket No. 46 ¶ 86.) She called her doctor and ultimately determined it was unnecessary for her to come in for an examination. (*Id.* ¶ 87.) After receiving the email from Bonner-Gibson, Skrabut emailed Ms. Haney regarding the situation. He told Ms. Haney, "We need to ask for her doctor[']s note at this point. [Bonner-Gibson] is very difficult to deal with and still has 6-weeks to go." Skrabut has testified that, when he said Bonner-Gibson was "difficult to deal with," he was referring to her longer history of issues such as absences, not merely issues related to the pregnancy. (*Id.* ¶¶ 89–92.)

Ms. Haney responded that the company "still" could not require Bonner-Gibson to provide a doctor's note for absences if it did not also require notes for other employees missing work for medical reasons. She suggested that they instead request a note clearing her to work. Ms. Haney also suggested that Skrabut give Bonner-Gibson a measurable task to see if she was actually working at home. "I don't care how menial it is," wrote Ms. Haney, "but something that will occupy 4 or 5 hours and has to be sent to you so you can hold her to 'working." Ms. Haney also wrote, "We will need documentation and something tactile [sic] about her lack [of] performance in her file," although it is not clear what the company would need that documentation for. (Docket No. 47-2 at 45.)

Skrabut sent a response email to Bonner-Gibson based on Ms. Haney's advice. First, he requested that Bonner-Gibson complete a quick-turnaround project for his review. Next, he wrote:

> [Y]ou seem to be having a lot of difficulties right now with your health. If you are meeting with the doctor today, please have him give you something that says it is ok for you to return to work. I need to make sure that you are not exerting yourself beyond what your doctor thinks is best for your preganency [sic].

(Docket No. 46 ¶ 88.) Skrabut also wrote an additional email to Ms. Haney, complaining of Bonner-Gibson's behavior:

> When you get back, we need to talk with her. There are complaints about her attitude in the office and things she is doing. Examples are keeping lights shut off that provide light to other employees, time spent in the bathroom (30-minutes at times), laying her head down on the conference table during a scheduling meeting, and now I have found her sleeping in her car while it is running in our parking lot by the side door. She is out of control and I need help addressing it with her.

(*Id.* ¶ 96.)

That day, September 20, 2017, Bonner-Gibson forwarded a letter from her OB-GYN, stating that the symptoms Bonner-Gibson had been experiencing were due to a stomach virus and that she could return to work when the symptoms subsided. The next morning, Bonner-Gibson sent an email, stating that she was still feeling ill and could not come to work but could work from home. (*Id.* ¶¶ 97–98.) Bonner-Gibson and Skrabut had an email exchange about work that Skrabut needed from her, and Bonner-Gibson eventually wrote:

> I apologize for catching the stomach flu. If it were my choice, I wouldn't be sleeping on the couch for two days straight vomiting into bags, having hot and cold chills, severe stomach cramps, and diarrhea. If I were even able to drive, I'm sure you wouldn't want me doing all of this in the office. It is such a shame that I feel obligated to work even when I am ill. I can't help the fact that I am sick. I come into work [every day] and give 110% even on days when I don't feel well, but whenever I get sick, I feel like you expect me to work anyway. I just wish you were a little more understanding that things happen and people get sick. Although we never discussed a deadline for the steel barrel brewery mezzanine to be complete, I will be in tomorrow and leave a PDF on your steps.

(*Id.* ¶ 99.) Bonner-Gibson forwarded the email to another Genesis employee, Victoria Robertson, complaining that she was treated unfairly when she was sick, including that she would "always get phone calls and emails telling me what I should have gotten done [and] saying they need it now." (*Id.* ¶ 100.)

Bonner-Gibson returned to work the next day, September 22, 2017. At one point during the day, Skrabut approached her and asked to speak to her outside. Skrabut chastised her for having allegedly slept in her car when parked near the Genesis entrance during the day. Bonner-Gibson admits that she did rest in her car, but maintains that she did so only during her lunch break because she was feeling sick and weak. The argument expanded into a heated exchange about Bonner-Gibson's behavior and her treatment by Genesis. Bonner-Gibson has testified that she told Skrabut she believed she was being treated unfairly because she was a pregnant black woman. Skrabut has testified that he does not remember her making that remark. According to Bonner-Gibson, Skrabut yelled at her and told her that she "needed to reevaluate if [she] can work in this industry and if [she] can handle being an engineer." (*Id.* ¶¶ 104–08.) After the confrontation, Bonner-Gibson texted Robertson that "[n]one of these issues started popping up until [she] got pregnant." (*Id.* ¶ 110.)

**D. Bonner-Gibson's Maternity Leave and Return to Work**

Bonner-Gibson was induced into labor on October 17, 2017, causing her to begin her maternity leave earlier than anticipated. On November 21, 2017, Ms. Haney emailed Bonner-Gibson, asking if she was "on track for your return to work on Monday 12/4" and informing her that Skrabut wished to meet with her about the timeline for her P.E. licensure when she returned. It is now undisputed that Bonner-Gibson responded in a timely fashion to the email, confirming that she planned to return on December 4. Ms. Haney, however, claims that she did not see the

response at the time. (*Id.* ¶¶ 113–16.) Ms. Haney now admits that she told Skrabut and Yong, falsely, that Bonner-Gibson had never responded to the email. (Docket No. 35-6 ¶ 4.) Bonner-Gibson returned to work, as discussed, on December 4. When she did, Yong complained to her that the company did not know when she was returning because she had supposedly failed to respond to Ms. Haney's email. (Docket No. 46 ¶ 119.)

That afternoon, Bonner-Gibson informed Yong that she did not yet have childcare arrangements in place and would need to leave work at approximately 2:30 p.m. every day for the next few weeks, in order for her to take over childcare from her husband before he went to work. Bonner-Gibson had not previously informed Genesis that she would need any scheduling accommodation related to childcare. (*Id.* ¶¶ 120–21.) According to her testimony, Bonner-Gibson assured Yong that she and her husband had child care in place starting in a bit under a month, at the beginning of 2018.[1] (Docket No. 47-2 at 98.) She also claims that she offered to work from home in the afternoons and complete projects as needed. (*Id.* at 99.) Yong's testimony and Bonner-Gibson's testimony differ with regard to how the issue was resolved. Bonner-Gibson testified that she believed that Yong had given her permission to leave at the desired time if she also came in early. (*Id.* at 99, 198.) Yong testified that he told Bonner-Gibson that the change to her schedule would have to be approved by Skrabut. (Docket No. 47-3 at 40, 60.) Yong has conceded, however, that he "did agree" to allow her to leave at 2:30 p.m. on the day of the initial request. (*Id.* at 46.) Yong testified that he told Skrabut, that day, about his conversation with Bonner-Gibson about leaving early. (*Id.* at 36.)

---

[1] In her briefing, Bonner-Gibson contends that her lack of childcare immediately after the conclusion of her maternity leave was the result of two unexpected events: first, her having given birth—and, therefore, having begun and completed the maternity leave—ahead of schedule; and, second, her mother-in-law's last-second reneging on an agreement to provide childcare for the interim period before Bonner-Gibson's long-term childcare arrangements took effect. (Docket No. 45 at 9 & n.4.)

The next day, December 5, 2017, Bonner-Gibson was preparing to leave the office at around 2:30 when Yong approached her and asked if she and Skrabut had discussed the 2:30 departure time. She responded that they had not. Yong testified that he tried to get Skrabut to come and meet with them about it, but it was too late and Bonner-Gibson needed to leave to take over for her husband. Bonner-Gibson, accordingly, left for the day. (Docket No. 46 ¶¶ 127–28; Docket No. 47-3 at 36–37.)

The following day, December 6, 2017, would turn out to be Bonner-Gibson's last full day at Genesis. That day, Skrabut worked in a conference room behind Bonner-Gibson's desk. Neither Skrabut nor Bonner-Gibson approached the other about the issue of Bonner-Gibson's departure time, and Bonner-Gibson left at 2:30. (Docket No. 51 ¶ 129.) When asked why he did not approach Bonner-Gibson about any concerns during that day or before, Skrabut stated that it was Bonner-Gibson's responsibility to come to him and all he knew, at the time, was "hearsay between [Yong and Bonner-Gibson]." (Docket No. 47-5 at 171.)

## E. Final Conflict with Skrabut and Termination

That evening, Skrabut wrote Bonner-Gibson a lengthy email, complaining about a number of issues, including the 2:30 departure time and Bonner-Gibson's supposed failure to respond to the company's attempts to confirm her return date. He concluded:

> You are obligated as an employee to gain approval prior to taking any action regarding your attendance at work. While we are all busy throughout the day, it is inexcusable for you to not have taken the time in the last three (3) business days to discuss your situation with us. This includes the number of hours I personally spent today working out of our conference room directly behind your workspace.
>
> Your recent actions, along with our discussions prior to your leave, continue a pattern of unprofessional behavior that will not be tolerated in our environment. It is your responsibility to correct this situation immediately.

(*Id.* ¶ 131.)

The next morning, December 7, 2017, Bonner-Gibson responded with her own lengthy email. She explained that she thought she had received approval for the temporary change in her schedule from Yong. She offered to return to the office with her child after 2:30 if it was necessary. She also explained that she believed that the way she had handled the matter had been consistent with how absences had been dealt with at Genesis until that point. "In the past," she wrote, "all that was required is for me to communicate my whereabouts with either you or [Yong] if I was going to be out. This is not only the case with me, but with other employees as well. If this has changed and I now need to meet with each of you, then I will make this change." Bonner-Gibson complained that, if Skrabut had needed to talk to her about the issue, he could have approached her, adding, "I cannot read your mind[,] Russell." (*Id.* ¶ 133.)

Bonner-Gibson concluded the email with a general defense of her behavior in the period surrounding her maternity leave:

> I am not sure why your opinion and treatment of me has suddenly changed this year, but my behavior has been the same since I have been an employee at Genesis. I have not changed and I remained professional throughout my time here. I am polite and have not disrespected anyone in [any way]. While I was 7 months pregnant, I did lay down in my car during my lunch break. You can call it unprofessional but I was sick and did not know what was wrong with me. I felt extremely emaciated and feared I would pass out and cause harm to my unborn child. At the time, I did not know I had a viral stomach infection, but I knew I could not drive myself to the doctor or lay down in the middle of the office floor. If you see this as unprofessional, then I apologize but I see it as being dedicated because I did everything in my power to gain relief so I could finish my work and meet our project deadlines. Even with my declining health during the end of my pregnancy I still make it a priority to work over 40 hours per week to meet your deadline. As a result of this tedious work schedule, I was diagnosed with preeclampsia. I nearly lost my life due to this condition and I am still battling its [effects] today. I have dedicated my life to this company, and put my work before my family. No matter how much Genesis puts on my plate, I always get the job done even when other members of the team cannot meet the project schedule.
>
> In regards to responding to [Ms. Haney], I replied to her email the same day she sent it to me and a photo of the correspondence along with the date and time it was sent is attached.

> If you would like to speak to me further, just communicate when you are available and I will be there.

(*Id.*) She included a photo of her response to Ms. Haney. (*Id.*)

Bonner-Gibson forwarded copies of the email to her mother, her husband, and another Genesis employee, Chinh Cao. (*Id.* ¶ 134.) Skrabut has testified that he learned that Bonner-Gibson had forwarded the email around the time of her termination but was not sure if it was before or after. (*Id.* ¶ 135; Docket No. 35-2 at 71.) During a later telephone appeal regarding Bonner-Gibson's requested unemployment benefits, however, Ms. Haney claimed that the forwarding of the email was a factor in the termination. Genesis no longer claims that to be the case and admits that Ms. Haney "has indicated that she made such statement based on second-hand knowledge gained from a review of the documents she had in front of her at the time, including the forwarded email." (Docket No. 46 ¶ 136.)

The morning of December 7, 2017, after Bonner-Gibson's email, Skrabut requested that Bonner-Gibson meet with him and Yong. In the meeting, Skrabut informed Bonner-Gibson that she was terminated. In his explanation, he focused on her post-maternity leave schedule change. According to Bonner-Gibson, Skrabut stated, "The only reason why we're firing you is because you left three consecutive days in a row without approval from us." (*Id.* ¶¶ 141–42.) Bonner-Gibson also testified, however, that Skrabut stated that he was upset about the conversation the two had had in September, when Bonner-Gibson allegedly mentioned being treated differently because she was a pregnant black woman. According to Bonner-Gibson, Skrabut complained that she had made him sound like a racist. (*Id.* ¶¶ 144–45.) Skrabut and Yong deny that the September conversation came up at all in the meeting terminating Bonner-Gibson. (*Id.* ¶ 145.)

Yong has testified that the reason that Skrabut gave Bonner-Gibson for her termination was her insubordinate and disrespectful behavior surrounding the schedule change issue. (Docket No. 47-3 at 19.) After the termination, Bonner-Gibson received a written Separation Notice, confirming that the separation was "due to her leaving work early three consecutive days without prior notification and approval," which the Notice characterized as "unprofessional behavior" showing a "lack of respect for management." (Docket No. 46 ¶ 143.)

On March 21, 2018, Bonner-Gibson filed her Complaint against Genesis, pleading causes of action for discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981") and the Tennessee Human Rights Act, Tenn. Code. Ann. § 4-21-101, *et seq.* ("THRA"). (Docket No. 1 ¶¶ 50–60.) She expressly reserved her right to amend the Complaint to include additional federal claims that, at the time, had not been administratively exhausted. (*Id.* ¶ 61.) On May 21, 2018, she filed an Amended Complaint adding causes of action for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Docket No. 16 ¶¶ 61–67.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court

must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578

F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth

of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence

in support of the [non-moving party's] position will be insufficient," and the party's proof must be

more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only

if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing

*Anderson*, 477 U.S. at 252).

## III. ANALYSIS

Although Bonner-Gibson pleaded various theories of discrimination and retaliation, she

has, in her briefing, indicated that she is now pursuing only "discrimination claims under Title VII

(PDA) and retaliation claims under Section 1981, Title VII (PDA), and the THRA." (Docket No.

45 at 15.) The court will, accordingly, limit its analysis to those claims and grant Genesis's motion

as uncontested with regard to Bonner-Gibson's other claims.

## A. Prima Facie Case of Pregnancy Discrimination

"Under the Pregnancy Discrimination Act provisions of Title VII, discrimination because

of or on the basis of pregnancy, childbirth, or related medical conditions is defined as a kind of sex

discrimination and is prohibited." *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572

(6th Cir. 2006) (citing 42 U.S.C. § 2000e(k)). A plaintiff may prove a pregnancy discrimination

case, like any other Title VII case, either by direct evidence or by circumstantial evidence. If a

plaintiff does not have direct evidence of pregnancy-based discrimination, the court must analyze

the case under "the familiar *McDonnell Douglas* burden-shifting framework." *Asmo v. Keane, Inc.*,

471 F.3d 588, 592 (6th Cir. 2006). In order to establish a prima facie case of pregnancy discrimination in a typical case, a plaintiff must show that: (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision. *Prebilich–Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 442 (6th Cir. 2002) (citation omitted). "If the employee is able to present such a case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision." *Asmo*, 471 F.3d at 592 (citation omitted). Once the employer provides a legitimate, non-discriminatory reason, "the burden shifts back to the employee, who, in order to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination." *Id.* (citation omitted).

It is undisputed that Bonner-Gibson can satisfy the first three elements of the prima facie case. With regard to the first element, it is enough that Bonner-Gibson was pregnant during the period relevant to the case, even if she was no longer pregnant when she was fired. "The PDA applies to 'women affected by pregnancy, childbirth, or related medical conditions,'—not just to women who *are* pregnant." *Canales v. Schick Mfg., Inc.*, No. 3:09CV253 (MRK), 2011 WL 4345006, at *1 (D. Conn. Sept. 15, 2011) (quoting 42 U.S.C. § 2000e(k)); *see Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 469–70 (6th Cir. 2005) (holding that district court erred in holding that the PDA did not protect a woman because she was not pregnant at the time). With regard to the second and third elements, Genesis concedes that Bonner-Gibson was at least generally qualified for her job—although she did need to complete her licensure—and that Genesis's firing her was an adverse employment action. Genesis argues, instead, that Bonner-Gibson cannot establish the fourth element of her prima facie case, a nexus between her pregnancy and Genesis's termination of her employment.

Bonner-Gibson argues first that she has established a nexus between her pregnancy and the loss of her job because she was fired so shortly after giving birth and returning to work. The Sixth Circuit has recently suggested, in an unpublished opinion, that, "where an adverse action occurs soon after pregnancy, courts can infer a nexus from the temporal proximity." *Kubik v. Cent. Mich. Univ. Bd. of Trustees*, 717 F. App'x 577, 582 (6th Cir. 2017) (citing *Asmo*, 471 F.3d at 594). More typically, however, courts calculate temporal proximity for these purposes based the amount of time "between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee." *Asmo*, 471 F.3d at 594; *see also DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 391 (6th Cir. 2005) (discussing temporal proximity relative to the employee's "announcement of her pregnancy"). In this case, Genesis was aware of Bonner-Gibson's pregnancy for several months before she was terminated. During those several months, moreover, Genesis and its personnel largely behaved as if operating under the assumption that Bonner-Gibson would return to work as normal following her maternity leave. The inference of a nexus based on the timing of her pregnancy announcement is, therefore, not as strong as it would be in a case where the announcement and adverse action were closer together in time. *See Bailey v. Oakwood Healthcare, Inc.*, No. 15-11799, 2017 WL 3616478, at *14 (E.D. Mich. Aug. 23, 2017) (noting that an inference of a nexus based on temporal proximity is usually based on a period of "less than six months") (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566–67 (6th Cir. 2000)), *aff'd*, 732 F. App'x 360 (6th Cir. 2018)

That is not to say that the date of the employee's pregnancy announcement is necessarily the only date that matters. Admittedly, calculating temporal proximity based on the employer's notice is, generally speaking, consistent with the Sixth Circuit's approach in other areas. For example, when considering a claim for retaliation under the Family and Medical Leave Act

(FMLA), the Sixth Circuit looks to "the 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 452 (6th Cir. 2017) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The specific language of the PDA, however, complicates matters, because it forbids discrimination "on the basis of pregnancy, childbirth, *or* related medical conditions." 42 U.S.C. § 2000e(k) (emphasis added). In other words, the PDA's "protection extends to the whole range of matters concerning the childbearing process." *Kocak*, 400 F.3d at 469 (quoting H.R. Rep. 95–948, 1978 U.S.C.C.A.N. 4749, 4753) (emphasis omitted). As a result, the PDA reaches discrimination based on events that might occur after an employer learns of the employee's pregnancy. The date on which the pregnancy was announced, therefore, might not be the only important date for temporal proximity purposes.

In any event, as Bonner-Gibson points out, there is ample additional evidence from which a nexus can be inferred in this case, rendering the question of whether temporal proximity alone would be sufficient ultimately beside the point. For example, Skrabut complained, in response to what appeared, at the time, to be a pregnancy-related absence, that Bonner-Gibson was "very difficult to deal with and still ha[d] 6-weeks to go." (Docket No. 46 ¶ 89.) He was, moreover, not merely venting; he and Ms. Haney worked together to form a response, which included, at Ms. Haney's suggestion, creating an artificially demanding deadline for Bonner-Gibson's work and pretextually requiring a doctor's note clearing her to return to work, when the actual motivation was imposing the equivalent of a doctor's note requirement on her absences but not other employees'. Then, after Bonner-Gibson had given birth, Ms. Haney, fully knowing that Skrabut had already become frustrated, mishandled Bonner-Gibson's maternity leave and return date in a way that falsely gave the appearance that Bonner-Gibson was being unreasonable and

unresponsive about the timing of her return. Aside from those two incidents, Skrabut allegedly voiced repeated concerns, to Bonner-Gibson, that she would no longer be sufficiently dedicated to her job following her pregnancy. *See Figgins v. Advance Am. Cash Advance Centers of MI, Inc.*, 476 F. Supp. 2d 675, 691 (E.D. Mich. 2007) (relying on supervisor's pregnancy-related comments to establish nexus). Bonner-Gibson has also testified that Skrabut and Yong became less willing to mentor her after they learned she was having a child. These facts, considered alongside the timing of Bonner-Gibson's firing, are enough to establish the requisite nexus for the prima facie case.

The parties devote a substantial amount of briefing to whether Bonner-Gibson has established that similarly-situated non-pregnant employees were treated differently than she was. It is unclear to the court why such a showing would be strictly necessary in a case, such as this one, where the nexus requirement can be met with other evidence. *See Huffman v. Speedway LLC*, 21 F. Supp. 3d 872, 877 (E.D. Mich. 2014) (noting that the "similarly-situated employees" analysis is only one way to show nexus, and there are "other ways" to do so), *aff'd*, 621 F. App'x 792 (6th Cir. 2015). Regardless, insofar as it matters, Bonner-Gibson has identified employees who were "similarly situated in [their] ability or inability to work [and who] received" the benefit of the flexible leave policy for personal or family reasons without being fired.[2] *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 483 (6th Cir. 2013) (quoting *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996)). Even if these employees' situations differed from Bonner-Gibson's in some respects, the Sixth Circuit has recognized that the PDA incorporates a relaxed version of the comparator inquiry that focuses on employees' similar abilities to work. *See Ensley-Gaines*, 100 F.3d at 1226; *see also Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1354 (2015) ("[A]

---

[2] In particular, Bonner-Gibson identifies Dan Schafran and Jacob Heltemes, both of whom were allowed accommodations in their schedules in order to meet family commitments. (*See* Docket No. 46 ¶¶ 165, 176.)

plaintiff alleging that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act's second clause may make out a prima facie case by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'"). Bonner-Gibson has identified employees similar to her in their ability to work who received flexibility to their schedules that she, post-pregnancy, did not. That evidence, as well as all of the other circumstantial evidence discussed by the court, supports the inference of a nexus between Bonner-Gibson's pregnancy and her being fired, shifting the burden to Genesis to produce a legitimate, non-discriminatory reason for its decision.

## B. Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in a protected activity, (2) her exercise of such protected activity was known by the defendant, (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff, and (4) a causal connection existed between the protected activity and the materially adverse action.[3] *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

Bonner-Gibson identifies two incidents that, she argues, constituted protected activity sufficient to support her retaliation claims. First, she relies on her September 22, 2017 argument with Skrabut, in which she allegedly informed him that she believed that she was being treated differently because she was a pregnant black woman. Second, she relies on her comments in her email of December 7, 2017. "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of

---

[3] The same general framework applies for considering claims for retaliation under Title VII, Section 1981, and the THRA. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018); *Wade v. Automation Pers. Servs.*, Inc., 612 F. App'x 291, 300 (6th Cir. 2015). Genesis has not premised its arguments on any differences between the cases for retaliation under the three statutes.

Title VII." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Although a "a vague charge of discrimination" is not sufficient to constitute a protected activity, a plaintiff's complaint is not required to have been made with "absolute formality, clarity, or precision." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

Genesis does not dispute that Bonner-Gibson's alleged September 22 complaint that she was being treating differently as a pregnant black woman is sufficient to meet the "protected activity" prong of the prima facie case. With regard to her comments of December 7, however, Genesis argues that the complaints raised in Bonner-Gibson's email were mere allegations of general unfairness, which would not be protected under any of the relevant statutes. It is true that that email, read in a vacuum, appears to not refer to pregnancy or race, in that Bonner-Gibson stated that she was "not sure why [Skrabut's] opinion and treatment of [her] ha[d] suddenly changed th[at] year." (Docket No. 146 ¶ 133.) By the time that the email was sent, however, Skrabut had already been informed, by Bonner-Gibson, that she was concerned that the reason for the change in her treatment was her pregnancy. In the context of that background fact, Bonner-Gibson's email can be fairly construed as her renewing her complaints about being treated differently due to her pregnancy. A reasonable juror could, therefore, construe the December 7 email as engaging in a protected activity.

As with her PDA claim, Bonner-Gibson argues that she can establish a causal nexus based on both temporal proximity alone and additional evidence. With regard to the December 7 email, the temporal proximity of less than a day is easily sufficient. Even if one ignores the December 7 email, however, the two- to three-month period between the September 22 incident and the decision to fire Bonner-Gibson is similar to the delays that courts in this circuit have typically

found to support an inference of a nexus. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir. 2018) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases)). Genesis argues that the temporal proximity of the September 22 remarks is insufficient to show nexus because Bonner-Gibson's comment was just one brief part of a larger workplace dispute. Insofar as that is relevant, however, it bears noting that the larger dispute was explicitly about Bonner-Gibson's dedication to her job, an issue that Skrabut allegedly repeatedly, in other conversations, tied to her pregnancy and her becoming a mother. Bonner-Gibson's remark, therefore, was not some inconsequential aside in the context of the larger dispute between the two.

Genesis, moreover, concedes that Skrabut's alleged later expression of concern that Bonner-Gibson's September 22 remarks had made him seem racist would be evidence of a retaliatory nexus. Genesis attempts to undermine Bonner-Gibson's testimony regarding those remarks by pointing out that Bonner-Gibson did not mention them until well into this litigation, despite having had earlier opportunities to do so. Unless Genesis can actually show that Bonner-Gibson is estopped from asserting a fact, or it obtains a discovery sanction to prevent her from doing so, Genesis's argument goes to credibility and is inappropriate for summary judgment. Bonner-Gibson has, therefore, shown a nexus between her termination and her protected activity, based on temporal proximity as well as additional evidence.

## C. Legitimate Nondiscriminatory Reason/Pretext

Genesis claims that it terminated Bonner-Gibson "due to her decision to unilaterally alter her work schedule and for responding to her supervisor in an insubordinate fashion." (Docket No. 33 at 21.) Because Genesis has produced a legitimate, non-discriminatory reason for its actions, the burden shifts back to Bonner-Gibson to demonstrate that her employer's given reason was pretextual.

To establish pretext, a plaintiff can show that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the adverse action; or (3) were insufficient to explain the adverse action. *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (*en banc*)). "Pretext may be shown either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir.1994)). A plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the employer's] explanation and infer that . . . the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (citations and internal quotations marks omitted). "In keeping with the burden required at the summary judgment stage, a plaintiff 'need only identify genuine disputes of material fact regarding the legitimacy of the defendant's stated reasons.'" *Kirkland v. James*, 657 F. App'x 580, 586 (6th Cir. 2016) (quoting *Wheat v. Fifth Third Bank*, 785 F.3d 230, 240 (6th Cir. 2015)).

As evidence of pretext, Bonner-Gibson first identifies Genesis's allegedly shifting rationales for her termination. For example, in his initial email, Skrabut complained not only about Bonner-Gibson's failure to get his approval to leave early, but also her failure to "discuss [the] situation with *us*." (Docket No. 46 ¶ 131 (emphasis added).) But Bonner-Gibson *did* discuss her situation with Yong, which Skrabut knew, and Yong, by his own admission, approved her early departure time at least once. Skrabut's initial email, moreover, included a complaint about Bonner-Gibson's communication regarding her return date that Bonner-Gibson denied and that both parties

now agree was false. Third, and perhaps most notably, Ms. Haney offered a reason for termination in an earlier proceeding that has since been brought into question by Skrabut's own testimony and abandoned by Genesis. Genesis admits that Ms. Haney simply asserted the reason, based on her own review of materials in Bonner-Gibson's file that might support termination, without any personal knowledge that the forwarding of the email had actually played any role in the decision to fire Bonner-Gibson. (Docket No. 35-6 ¶ 8; Docket No. 46 ¶ 36.) Reading the facts in the light most favorable to Bonner-Gibson, those are three grounds for termination that have had to be set to the side or revised because the facts did not support them.

Even in this litigation, Genesis has taken a somewhat amorphous approach to explaining its grounds for firing Bonner-Gibson—alluding to and even offering evidence of various performance, attitude, and licensure issues, despite Skrabut's contemporaneous claim that Bonner-Gibson was fired for leaving work early. A defendant's "piling on of justifications" for its actions may be "probative of pretext," especially where some of those justifications are in tension with each other. *Gay v. Timberlake Homes, Inc.*, No. CIV. A. RDB-07-1930, 2008 WL 3075588, at *10 (D. Md. Aug. 1, 2008) (citing *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000)). The claim that Bonner-Gibson was a low-performing employee whose termination would have been justified regardless is difficult to square with the company's own statements of its reasons at the time of the firing and in the immediate aftermath. Genesis's argument borders on admitting that its stated reason for firing Bonner-Gibson was, in fact, pretext—just pretext for something other than discrimination or retaliation.

There are, moreover, aspects of Genesis's account that a reasonable juror could be justified in finding implausible. Genesis has repeatedly claimed that Bonner-Gibson unilaterally chose to leave early three days in a row. But Yong himself has testified that he gave her permission to leave

early on the first day. Then, Bonner-Gibson's behavior the next two days was consistent with her account that she believed her actions were authorized. There is no evidence that she sneaked out or tried to conceal her early departures. Skrabut, moreover, was informed of Bonner-Gibson's request to Yong almost immediately, and he easily could have raised the issue with Bonner-Gibson in person. But he did not, despite working mere feet from her on her final full day. A reasonable juror could look at that behavior, particularly in the context of Skrabut's alleged repeated comments about new mothers at work, and see an employer/manager seizing on an employee's workplace misstep to spring a trap that will justify firing her for an improper reason.

Furthermore, when Skrabut finally confronted Bonner-Gibson via email, she offered a seemingly plausible explanation that the issues he had raised were the result of misunderstandings. Indeed, at least one of the accusations Skrabut made was, Genesis now concedes, false, and Bonner-Gibson denied it as such, with evidence. Whether the issue of permission to leave early was also the result of a misunderstanding is up for debate, but Bonner-Gibson gave Skrabut reason at least to consider the possibility. A reasonable juror could find it implausible that Bonner-Gibson, an employee of several years whom Yong and Skrabut had previously mentored, was fired for something that could be easily explained away as a miscommunication. *See N.L.R.B. v. Health Care Mgmt. Corp.*, 917 F.2d 1304 (Table), 1990 WL 170426, at \*2 (6th Cir. 1990) (observing that the "implausibility of the employer's asserted reasons for its actions" may be evidence of pretext).

Of course, all of this depends on whose version of events one believes. Genesis, Skrabut, and Yong have offered an alternative account of their actions, and, if a jury credits them, then the jury may well reject Bonner-Gibson's claims. That kind of credibility determination is not, however, appropriate on a motion for summary judgment. The court will deny Genesis's motion with regard to the claims that Bonner-Gibson continues to pursue. Because Bonner-Gibson has

limited her opposition to Genesis's Motion for Summary judgment to her pregnancy discrimination claim and her non-ADA retaliation claims, the court will grant Genesis summary judgment on the remaining claims she has pleaded, namely, her claims for discrimination on the basis of race and disability and her claim for retaliation under the ADA.[4]

## IV. CONCLUSION

For the foregoing reasons, Genesis's Motion for Summary Judgment (Docket No. 32) will be granted in part and denied in part. Genesis will be granted summary judgment on Bonner-Gibson's claims for race and disability discrimination, as well as her claim for retaliation under the ADA. It will be denied summary judgment on her pregnancy discrimination and remaining retaliation claims.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[4] Genesis argues that Bonner-Gibson has also abandoned her sex discrimination claim. Under the PDA, however, pregnancy discrimination is a species of sex discrimination, not a distinct cause of action. The court will not introduce unnecessary complexity to this case by dismissing some hypothetical Title VII claims that Bonner-Gibson is not pursuing while leaving her PDA-based Title VII claim intact.